# IN THE COURT OF APPEALS OF IOWA

No. 17-0174
Filed April 5, 2017

**IN THE INTEREST OF R.M. and E.P.,**
**Minor children,**

**T.P., Mother,**
        Appellant.

_____


        Appeal from the Iowa District Court for Linn County, Susan F. Flaherty,

Associate Juvenile Judge.


        Mother appeals from an order terminating her parental rights pursuant to

Iowa Code chapter 232 (2016).  **AFFIRMED.**


        Deborah M. Skelton, Walford, for appellant mother.

        Thomas J. Miller, Attorney General, and Tabitha J. Gardner, Assistant

Attorney General, for appellee State.

        Jeannine L. Roberts, Cedar Rapids, guardian ad litem for minor children.


        Considered by Mullins, P.J., and Bower and McDonald, JJ.

**MCDONALD, Judge.**

Tara appeals from an order terminating her parental rights in her children, R.M. and E.P., pursuant to Iowa Code section 232.116(1)(h) (2016). Tara contends the State failed to prove the statutory ground authorizing the termination of her parental rights and the termination of her parental rights is not in the best interests of the children.

We review proceedings terminating parental rights de novo. *See In re A.M.*, 843 N.W.2d 100, 110 (Iowa 2014). The statutory framework is well established. Pursuant to section 232.116(1), the State must prove a statutory ground authorizing the termination of a parent's rights. *See In re P.L.*, 778 N.W.2d 33, 39 (Iowa 2010). Section 232.116(1) sets forth the harms the legislature has determined to be of sufficient concern to justify the breakup of the family unit. Second, pursuant to section 232.116(2), the State must prove termination of parental rights is in the best interest of the child. *See id.* Third, if the State has proved both the existence of statutory harm and termination of a parent's rights is in the best interest of the child, the juvenile court must consider whether any countervailing considerations set forth in section 232.116(3) should nonetheless preclude termination of parental rights. *See id.* These countervailing considerations are permissive, not mandatory. *See A.M.*, 843 N.W.2d at 113. "The court has discretion, based on the unique circumstances of each case and the best interests of the child, whether to apply the factors in this section to save the parent-child relationship." *In re D.S.*, 806 N.W.2d 458, 475 (Iowa Ct. App. 2011).

The State has the burden to prove its case by clear and convincing evidence. *See* Iowa Code § 232.96. "Clear and convincing evidence is more than a preponderance of the evidence and less than evidence beyond a reasonable doubt." *In re L.G.*, 532 N.W.2d 478, 481 (Iowa Ct. App. 1995). "It is the highest evidentiary burden in civil cases." *In re M.S.*, 889 N.W.2d 675, 679 (Iowa Ct. App. 2016). "It means there must be no serious or substantial doubt about the correctness of a particular conclusion drawn from the evidence." *Id.* This significant burden is imposed on the State to minimize the risk of an erroneous deprivation of the parent's fundamental liberty interest in raising his or her child. *See Santosky v. Kramer*, 455 U.S. 745, 759 (1982). We therefore cannot rubber stamp what has come before; it is our task to ensure the State has come forth with the quantum and quality of evidence necessary to prove each of the elements of its case. *See id.* at 769.

We turn to the facts of this case. The family came to the attention of the Iowa Department of Human Services (IDHS) following R.M.'s birth in 2013. The hospital staff perceived Tara to have cognitive and functional impairment and was concerned about Tara's ability to care for the child. Hospital staff requested IDHS make an assessment to determine whether to initiate assistance proceedings. A social worker conducted an interview and assessment with Tara in the hospital. Tara agreed to the initiation of assistance proceedings and the receipt of services. Tara was allowed to leave the hospital with R.M. in her care subject to the protective supervision of IDHS. Tara subsequently stipulated R.M. was a child in need of assistance within the meaning of chapter 232.

The mother received a great number and variety of services in support of her and the child, including psychological and intelligence testing. The intelligence tests confirmed Tara has significant cognitive and functional impairment. Her IQ is 60, placing her in the bottom 0.4 percentile of all adults. Her overall level of adaptive functioning is in the bottom 1% of the population. Her capacity for commonsense judgment was found to be particularly poor, again at the bottom 1% of the population. Her cognitive and functional impairment prevents her from planning and from being able to assess the needs of others.

In October 2014, IDHS concluded Tara could not safely care for R.M. There were numerous incidents supporting the conclusion. Of greatest import was the fact R.M. was observed to have numerous, unexplained bruises and scrapes. Many of the bruises and scrapes were on the child's forehead, cheeks, legs, and buttocks. R.M. was removed from Tara's care and placed in foster family care. Following R.M.'s placement in foster family care, her injuries were notably reduced.

E.P. was born in January 2015, and he was immediately removed from Tara's care and placed in foster famiy care.

Following removal of the children, IDHS continued to provide Tara with support services. Tara also received additional services from different agencies because of her intellectual disability, including housing support and Social Security Disability Income. IDHS hoped the significant resources provided to Tara would prove sufficient to allow for reunification of the family. IDHS's hopes were not realized. IDHS ultimately concluded the children could not be returned safely to Tara's care despite the best efforts of all involved, including Tara. The

juvenile court agreed and terminated Tara's parental rights in both children pursuant to section 232.116(1)(h).

Tara challenges the sufficiency of the evidence supporting the statutory ground authorizing termination of her parental rights. As relevant here, the State was required to prove by "clear and convincing evidence that the child cannot be returned to the custody of the child's parents as provided in section 232.102 at the present time." Iowa Code § 232.116(1)(h)(4). "[A] child cannot be returned to the custody of the child's parent under . . . section 232.102 if by doing so the child would be exposed to any harm amounting to a new child in need of assistance adjudication." *In re M.M.*, 483 N.W.2d 812, 814 (Iowa 1992). We have interpreted this provision to require the State to prove the child would be exposed to an "appreciable risk of adjudicatory harm." *M.S.*, 889 N.W.2d at 683.

The case most relevant to our resolution of this appeal is *In re A.M.* In that case, IDHS removed a newborn from the care of the parents on concerns of the parents' ability to care for the child due to cognitive impairment. IDHS provided the family with a significant number of services, and the parents made a good-faith effort to comply with the services. The parents were simply unable to internalize the necessary parenting skills to safely care for the child. The supreme court explained "[A] parent's 'lower mental functioning alone is not sufficient grounds for termination.' But where it affects the child's well-being, it can be a relevant consideration." *A.M.* 843 N.W.2d at 111 (citation omitted). The supreme court concluded termination pursuant to section 232.116(1)(h) was proper where "neither the mother nor father can internalize the necessary skills to

keep A.M. safe and developing properly without the hovering supervision of [I]DHS workers." *Id.* at 111–12.

This record presents a stronger case supporting the termination of parental rights than *A.M.* Here, the mother has a greater cognitive and functional impairment than either of the parents in *A.M.* and is more limited in her ability to care for herself, let alone care for others. The mother's inability to care for the children manifested itself in numerous ways throughout the course of this proceeding. For example, the mother demonstrated an inability to properly clothe and feed the children. When the mother attended medical appointments with the foster family, the mother was unable to understand the outcome of the appointments. The mother never exercised visitation without some level of supervision and never progressed to overnight visits due to concerns about the mother being able to care for both children at the same time. One service provider testified the children could not be returned to the mother's care without ongoing daily supervision and support. Another testified Tara cannot be alone with the children for more than a few hours without concern.

Unlike *A.M.*, Tara has exposed the children to physical abuse. On one occasion, a concerned citizen called the police after observing Tara verbally abuse R.M. in a laundromat. As noted above, R.M. suffered unexplained bruising and scrapes while in the mother's care. The injuries stopped occurring when the child was removed from the mother's care. A founded report of child abuse was made, although the perpetrator remained unidentified. Also unlike A.M.'s parents, Tara has engaged in criminal conduct. Tara was arrested for theft arising out of shoplifting incident. Finally, unlike the parents in *A.M.*, Tara

was not able to comply with the safety plan. She associated with criminals and substance abusers. These persons were in her apartment and in the presence of R.M. while R.M. was still in Tara's care. We thus conclude the State proved return of the children to Tara's care would pose an appreciable risk of adjudicatory harm to the children.

We must still determine whether termination of Tara's parental rights is in the children's best interests. *See P.L.*, 778 N.W.2d at 41. "We consider what the future holds for the child[ren] if returned to [their] parents." *In re R.M.*, 431 N.W.2d 196, 199 (Iowa Ct. App. 1988). As in *A.M.*, it is clear Tara would not be able to safely care for the children without the "hovering supervision" of numerous support workers. The children have a need for permanency. They are thriving in their foster-care placements. The caseworker testified the children appear to have a stronger bond with the foster mother than with Tara. While the mother in this case clearly loves her children and clearly made a good-faith effort to avail herself of services, "[i]t is well-settled law that we cannot deprive a child of permanency after the State has proved a ground for termination under section 232.116(1) by hoping someday a parent will learn to be a parent and be able to provide a stable home for the child." *P.L.*, 778 N.W.2d at 41.

There is no permissive consideration weighing against the termination of the mother's parental rights. *See* Iowa Code § 232.116(3).

For the above-stated reasons, we affirm the order terminating the mother's parental rights in her children.

**AFFIRMED.**